UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

J&J SPORTS PRODUCTIONS, INC.,

    Plaintiff,

v.

BEER 4 U, INC. and
SENA HYON KIM,

    Defendants.

Civil Action No. TDC-18-2602

## MEMORANDUM OPINION

Plaintiff J&J Sports Productions, Inc. ("J&J") alleges that Defendants Beer 4 U, Inc. and Sena Hyon Kim illegally exhibited a closed-circuit broadcast of a boxing match to which J&J owned the exclusive nationwide commercial distribution rights. J&J has asserted claims for violations of the Communications Act of 1934 ("the Communications Act"), 47 U.S.C. § 605 (2012), and the Cable Television Consumer Protection and Competition Act of 1992 ("the Cable Act"), 47 U.S.C. § 553. Pending before the Court is J&J's Motion for Summary Judgment on liability. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

J&J distributes sports and entertainment programming through closed-circuit television. It owned the exclusive commercial exhibition licensing rights to the nationwide broadcast of the September 12, 2015 welterweight championship fight between Floyd Mayweather, Jr. and Andre

Berto, as well as select undercard bouts, including the match between Badou Jack and George Groves (collectively, "the Fight").

On September 12, 2015, the night of the Fight, two investigators engaged by J&J visited Defendants' commercial establishment, Beer 4 U Sports Bar ("the Sports Bar") on Crain Highway in Waldorf, Maryland. The first investigator, James Osgood, went to the Sports Bar at 9:10 p.m. He paid no cover charge for entry and ordered a drink from the bar. Osgood observed five televisions and a projection screen. According to Osgood, the Jack-Groves undercard boxing match was being shown on the screens. He counted the number of patrons inside the bar three times between his arrival and his departure at 9:20 p.m. He counted 32 patrons each time. Osgood estimated that the Sports Bar's maximum capacity was approximately 150 people.

The second investigator, Melinda Johnson, arrived at the Sports Bar at 9:21 p.m. on the night of the Fight. She paid a $10.00 cover charge to enter the Sports Bar and observed nine televisions inside "showing a mix of ESPN, FX, and nothing." Joint Record ("J.R.") 16, ECF No. 44. She also saw a "Viewsonic projector displaying the boxing pay-per-view on the wall behind the stage." *Id.* Specifically, Johnson observed the Jack-Georges undercard fight projected onto the wall. She "noticed that the picture was lagging as if streaming from the Internet." *Id.* Johnson also counted the number of patrons inside the Sports Bar between her arrival and her departure from the bar at 9:55 p.m. On those occasions, she counted 39, 40, and 40 patrons, respectively. According to a posted Fire Marshal sign, Johnson saw that the Sports Bar's maximum capacity was 241 people.

Defendant Sena Hyon Kim is the owner, a director, a shareholder, and the resident agent of Beer 4 U, Inc. ("the Corporation"), the corporate entity that owns the Sports Bar. Kim is also

the manager of the Sports Bar and makes substantially all managerial decisions for it. The Sports Bar's bartenders act as her agents. She has a financial interest in the Sports Bar's activities.

Kim admits that Defendants did not pay a commercial licensing fee to J&J or otherwise secure its permission to broadcast the Fight at the Sports Bar. She acknowledges that on the night of the Fight, "portions or moments from" the Fight "were exhibited . . . in the performance area" of the Sports Bar. J.R. 39. Although Kim was present inside the Sports Bar on the night of the Fight, she denies any prior or first-hand knowledge of the Fight's broadcast inside the Sports Bar. According to Kim, the Fight was displayed by a third party without Defendants' knowledge or input. Rather, Kim asserts that she had specifically informed the Sports Bar's employees that no pay-per-view events were to be shown there, and that the Sports Bar did not advertise that the Fight would be broadcast that night.

Bobby Davis, the leader of a band that performed at the Sports Bar on the night of the Fight, has acknowledged that before Kim told him that the Fight could not be shown at the Sports Bar, a promoter had prepared flyers advertising that Davis's band would be performing at the Sports Bar on "Fight Night." J.R. 64. According to Davis, on the night of the Fight, a man he did not recognize came into the bar with a laptop. While Kim was tending bar in a different room, the man tried to pull up a boxing match on his computer and on a projector in the bar "but his screen kept freezing." J.R. 65. Having failed, the man left with his computer a few minutes later. Davis asserts that no boxing matches were actually shown at the Sports Bar that night.

In its Complaint, J&J alleges that, by exhibiting the Fight without purchasing a commercial license, Defendants violated the Communications Act and the Cable Act. J&J seeks statutory damages, attorney's fees, and costs.

## DISCUSSION

In its Motion, J&J seeks summary judgment under Federal Rule of Civil Procedure 56 on liability only. J&J argues that the undisputed facts establish that Defendants are liable under the Communications Act or the Cable Act.

### I. Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### II. Statutory Provisions

In its Complaint, J&J asserted claims under both the Communications Act, 47 U.S.C. § 605, and the Cable Act, 47 U.S.C. § 553. Although J&J does not explicitly seek summary judgment under § 553, based on the content of its memorandum in support of the Motion, the Court construes the Motion as seeking summary judgment under both provisions.

The Communications Act provides, in relevant part:

> No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport,

4

effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a). This provision prohibits the unauthorized interception or receipt of "digital satellite television transmissions." *J & J Sports Prods., Inc. v. MayrealII, LLC*, 849 F. Supp. 2d 586, 588 n.3 (D. Md. 2012).

Section 553 provides that: "No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1).

47 U.S.C. §§ 553 and 605 are strict liability statutes. *See* 47 U.S.C. § 605(e)(3)(C) (providing for enhanced damages for willful violations of the statute but allowing damages to be reduced to $250 if "the violator was not aware and had no reason to believe [the] acts constituted a violation of this section"), 47 U.S.C. § 553(c)(3)(B), (C) (providing for enhanced damages for willful violations of the statute but allowing damages to be reduced to $100 if "the violator was not aware and had no reason to believe [the] acts constituted a violation of this section"); *see, e.g., G & G Closed Circuit Events, LLC v. Gonzalez Ruiz*, 379 F. Supp. 3d 1061, 1065 (S.D. Cal. 2019).

Because § 605 and § 553 are strict liability statutes, J&J need show only that it had the exclusive commercial distribution rights to the Fight and that Defendants exhibited the Fight without authorization. Although J&J has not identified facts establishing whether the Fight was

received by satellite transmission or cable, and therefore which specific statute is implicated, there is no claim that summary judgment cannot be granted without evidence of the specific method of interception. Indeed, J&J has offered facts, as stated in the affidavit of J&J President Joseph M. Gagliardi, establishing that the methods available to intercept the Fight would be encompassed by these two categories. The Court therefore considers whether the record establishes that one or more of Defendants is liable for unlawfully broadcasting the Fight at the Sports Bar without a license.

### III. Beer 4 U, Inc.

As to liability for the Corporation, J&J has established that it had exclusive distribution rights to the Fight, as reflected in the license agreement between J&J and the promoter of the Fight, which granted J&J an exclusive license to exhibit it through closed-circuit live television at commercial outlets throughout the United States. According to a review of J&J's records, Defendants did not have a commercial license to exhibit the Fight.

J&J has also established that the Fight was exhibited for at least a limited amount of time at the Sports Bar without J&J's authorization. In their affidavits, J&J's investigators state that they visited the Sports Bar on the night of the Fight and saw the broadcast of one of the undercard bouts included in J&J's exclusive license. Osgood observed it on the televisions, while Johnson saw it projected on the wall behind the stage.

Meanwhile, Defendants offer conflicting accounts. While Davis states that no boxing matches or other fights were shown at the Sports Bar on September 12, 2015 and contends that at most an unknown individual attempted but failed to display the Fight from a laptop computer, Kim has herself acknowledged in responses to requests for admissions that a third party succeeded in displaying "portions or moments" from the Fight that night. J.R. 39. That admission is consistent

with Johnson's observations of a lagging picture of the Fight as it was projected behind the bar's stage.

On this record, the Court does not find a genuine issue of material fact whether the Fight was shown at the Sports Bar, without J&J's authorization, for some duration of time. *See J & J Sports Prods., Inc. v. Jaschkowitz*, No. 5:14-cv-440-REW, 2016 WL 2727015, at *3-*4 (E.D. Ky. May 6, 2016) (finding a violation of the Communications Act where a patron exhibited a time-delayed fight, without plaintiff's authorization, using a smartphone hooked up to the bar's projection television). Of the four accounts presented, only Davis denies that the Fight was shown. His affidavit, however, does not establish that he was present throughout the evening, nor does it refute the possibility that some portion of the Fight could have been successfully shown while Davis was performing. Where Kim has herself acknowledged that the Fight was shown at least in part, the Court concludes that Davis's account does not create a genuine dispute of material fact.

As for authorization, Kim has acknowledged that Defendants did not order the Fight from J&J for broadcast at the Sports Bar. As a result, the facts in the record establish that Beer 4 U, as the owner of the Sports Bar, is liable for the unauthorized exhibition of the Fight. *See That's Entm't, Inc. v. J.P.T., Inc.*, 843 F. Supp. 995, 999 (D. Md. 1993) (holding a corporate defendant liable for the unauthorized exhibition of the broadcast of a boxing match to patrons at its commercial establishment); *J & J Sports. Prods., Inc. v. Get Away Lounge, Inc.*, No. TDC-13-3064, 2015 WL 4638060, at *2-3 (D. Md. July 30, 2015) (same); *Joe Hand Promotions, Inc. v. Dock Street Enters., Inc.*, No. WMN-11-1973, 2011WL6141058, at *4 (D. Md. Dec. 8, 2011) (finding a corporate defendant liable for the unauthorized exhibition of an ultimate fighting championship broadcast and rejecting the defendants' good faith defense as inapplicable because the statute provides for strict liability). The Court will grant the Motion as to Beer 4 U, Inc.

## IV. Individual Liability

J&J also seeks summary judgment as to liability against Kim in her individual capacity. For violations of § 605 or § 553 by an individual officer or employee of a corporation, courts have typically adopted the test for vicarious liability used in the context of copyright infringement. *See, e.g., MayrealII*, 849 F. Supp. 2d at 589 & n.5. Under *Softel, Inc. v. Dragon Medical & Scientific Communications, Inc.*, 118 F.3d 955 (2d Cir. 1997), frequently cited in § 605 and § 553 cases, a plaintiff must prove that the individual had both a "right and ability to supervise that coalesce[d] with an obvious and direct financial interest in the exploitation of copyrighted materials." *Id.* at 971 (citations omitted); *accord CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004) (stating that vicarious liability may be imposed in a copyright infringement action because "a defendant who has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities is . . . liable") (citations omitted). Courts have since articulated the test in broadcast piracy cases to require plaintiffs to show: (1) a "right and ability to supervise the violative activity, although [defendants] need not actually be supervising because [they] need not know of the violative activity," and (2) "a direct financial interest in the violation, i.e., financial benefits, even if not proportional or precisely calculable, that directly flow from the violative activity." *J & J Sports Prods., Inc. v. Ramsey*, 757 F. App'x 93, 95-96 (3d Cir. 2018) (collecting cases); *see also J & J Sports Prods., Inc. v. Brady*, 672 F. App'x 798, 801-02 (10th Cir. 2016) (observing courts' tendency to require a showing of the right and ability to supervise the violations, and an obvious and direct financial interest in the piracy, in § 605 cases involving both a corporate defendant and an individual defendant) (citations omitted).

Here, Ms. Kim does not dispute that she is the owner and an officer of Beer 4 U, Inc., the corporate owner of the Sports Bar. She further admits that she is the manager of the Sports Bar,

8

and that its employees, such as the bartenders, serve as her agents. Although she claims that the alleged violation took place for a brief period of time and thus occurred before she or anyone at the Sports Bar could act, she still had a right and ability to supervise the activities at the Sports Bar. Indeed, Kim has acknowledged that she makes all managerial decisions for the business and that she was present at the Sports Bar on the night of the Fight. Where Kim was in a position to personally manage the establishment and the entertainment exhibited to her patrons on the night of the Fight, the fact that she did not witness the exhibition of the Fight or authorize its exhibition does not absolve her of liability because actual knowledge or supervision of the violation is not required for vicarious liability to attach. *Ramsey*, 757 F. App'x at 95-96. Because Kim had the right and ability to supervise and control activities at Beer 4 U, including on the night of the Fight, the first prong of the test for vicarious liability is satisfied.

As to the second prong, whether Kim had a direct financial interest in the proceeds of the exhibition, courts focus on varying factors on this issue. Some courts have deemed an individual's admission of requisite control over the corporate defendant sufficient to satisfy this standard. *See, e.g., J & J Sports Prods., Inc. v. Sandoval & Sandoval, Inc.*, No. CBD-17-1392, 2018 WL 3727944, at *3 (D. Md. Aug. 3, 2018) (stating that the individual defendants, as corporate owners, were directly in line to profit from the unauthorized display of a fight to which the plaintiff held exclusive commercial distribution rights); *Zuffa, LLC v. Trappey*, No. 11-0006, 2012 WL 1014690, at *5 (W.D. La. Mar. 22, 2012) (noting that because the individual defendants admitted they were "officers, directors, shareholders and/or principals" of the company that owned the restaurant where the unauthorized broadcast occurred, they had conceded the requisite control and financial interest necessary to establish their vicarious liability).

Other courts have looked to evidence beyond the ownership interest and required plaintiffs to show that the individual defendant sought or received financial benefits, directly or indirectly, from the pirated broadcast. Such indicia of financial benefit include: advertising that the unauthorized program would be shown at the establishment; collecting a cover charge on the night of the event; whether the unlawful broadcast was a draw for customers; and whether the establishment hosted a large number of patrons purchasing food or drink during the event, thereby contributing to the defendant's profits. *See, e.g., J & J Sports Prods., Inc. v. Rubio*, No. CV-16-01111-PHX-JJT, 2017 WL 3234939, at *4 (D. Ariz. July 31, 2017) (declining to impose individual liability where the plaintiff provided no evidence of advertising in advance of the fight, that any patrons were drawn to defendants' establishment to watch the broadcast, or that more patrons were present in the establishment than on a standard night without the display of the plaintiff's content); *Brady*, 672 F. App'x at 802 (noting the defendant's obvious and direct financial interest in beer sales to bar patrons); *J & J Sports Prods., Inc. v. Ahuachapan Corp.*, 17-CV-01184 (LDH) (PK), 2019 WL 1274693, at *3 (E.D.N.Y. Mar. 20, 2019) (holding the corporate defendant's chief executive jointly and severally liable where it was undisputed that the establishment was fairly busy and patrons were ordering food and drinks while watching the fight).

Here, the record is insufficient to draw the conclusion that Kim had a direct financial interest in the Fight's unlawful broadcast. Viewing the facts in the light most favorable to the Defendants, the Fight was displayed not by the manager or employees of the Sports Bar, but by an unauthorized patron, who projected the broadcast for a very short period of time onto a wall inside the Sports Bar, without Kim's knowledge or authorization. The screen froze up, and the patron abandoned efforts to show the Fight and left. Under these circumstances, it is unclear whether there would have been any direct financial benefit to Kim, much less to the Sports Bar. With the

Fight displayed in the manner described by Davis and Kim, there is no evidence that any patrons entered the Sports Bar with an expectation that the Fight would be broadcast in such a way. Under Defendants' version of the facts, the broadcast failed almost immediately, such that there is no indication that patrons ordered food or beverages to consume while watching the Fight. Indeed, Kim has asserted that she had no advanced knowledge that the Fight would be shown, that she had actually instructed employees not to show it, and that there was no advertising that the Fight would be shown at the Sports Bar. Although Davis acknowledged that a flyer was created to advertise his band's performance on "Fight Night," J.R. 64, he has stated that it was created before Kim told him that the Fight would not be shown, and there is no evidence that the flyer was actually distributed or influenced any patron to visit the Sports Bar to watch the Fight. Notably, J&J's investigators did not claim to see any evidence of such a flyer.

Finally, there is conflicting evidence whether a cover charge was collected because Osgood has stated that he paid nothing, Johnson has asserted that she paid $10.00 just 11 minutes after Osgood's arrival, and Kim has denied that any cover charge was imposed that night. Moreover, any cover charge may have been associated with the band's musical performance, rather than the Fight. Thus, although financial benefits flowing from the broadcast need not be "precisely calculable," *Ramsey*, 757 F. App'x at 95-96, the Court concludes that there are genuine issues of material fact whether Kim received any direct financial benefit from the unauthorized broadcast such that the second prong has not been satisfied. Therefore, the Court will deny Motion as to Kim individually.

## CONCLUSION

For the foregoing reasons, J&J's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART. It will be granted as to liability against Beer 4 U, Inc. and denied as to liability against Kim. A separate Order shall issue.

Date: November 8, 2019

THEODORE D. CHUANG
United States District Judge